IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNE HENDERSON, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 12-5316 |
| CAROLYN W. COLVIN,[1] | : | |
| Commissioner of the | : | |
| Social Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                          December 20, 2013

This action was brought pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final

decision of the Commissioner of the Social Security Administration (the "Commissioner"), which

denied the application of Joanne Henderson (alternatively "Henderson" or "Plaintiff") for Social

Security Disability Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and

Title XVI of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* (the "Act").  Presently before the

Court is "Plaintiff's Brief and Statement of Issues in Support of Request for Review" ("Pl. Br.")

(Doc. No. 11); "Defendant's Response to Request for Review of Plaintiff" ("Def. Br.") (Doc. No.

14); "Plaintiff's Reply Brief" ("Pl. Reply") (Doc. No. 15); together with the record of the

proceedings before the Administrative Law Judge ("ALJ") and the Appeals Council (hereinafter

"R.").  Plaintiff asks the Court to vacate the Commissioner's final administrative decision and further

requests that this Court find that she is and has been disabled as alleged.  (Pl. Br. at 18-29.)  The

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Commissioner seeks the entry of an order affirming the decision of the ALJ that Plaintiff was not disabled.  (Def. Br. at 14).  For the reasons set out below, we recommend that the decision of the ALJ be vacated and the matter remanded for further proceedings.

## I.  FACTUAL AND PROCEDURAL HISTORY

This matter comes to this Court with a lengthy administrative and district court history.[2]  This is, in fact, the fourth time that this case has been in the district court.  In short, Henderson applied for benefits over nine years ago, there have been six administrative hearings, five administrative decisions, and the case has been remanded three times from the district court and once from the Appeals Council.

### A.  Henderson's Application for Benefits

Henderson protectively filed the application giving rise to this litigation on June 30, 2004, alleging disability since June 1, 2001.  (R. 207.)  She last met the earnings requirements for DIB on September 30, 2001, at which time she was 43 years old.  (R. 575.)  As a result, in order to be entitled to DIB, she had to establish disability at any time after June 1, 2001 but before September 30, 2001.

At the time of the alleged onset date, the only impairments which Henderson alleges to have been present were cervical cancer, obesity, and depression.  (R. 68-75.)  On July 26, 2001, after having been diagnosed with cervical cancer, she underwent a "radical abdominal hysterectomy, bilateral pelvic lymphedema, and left ovarian cystectomy," and on September 7, 2001, the doctor noted that "[h]er post-operative recovery has been smooth."  (R. 130.)  In 2001, her primary care provider also treated her intermittently for depression.  (R. 141-43.)

In 2003, Henderson was diagnosed with Hepatitis C.  (R. 372-81.)  The record reflects that she underwent intermittent treatment from 2003 until July 5, 2006, when she met with a hepatologist at the Albert Einstein Medical Center.  (R. 369-71.)  The record contains no further complaints, evaluations, or treatments related to the Hepatitis C diagnosis.

From 2004 through December 2006, Henderson was treated at New Life Community Health Services for major depressive disorder, post-traumatic stress disorder, and mood disorder.  (R. 191.) She met with Dr. Ronald H. Rosillo, a psychiatrist, on four occasions, and with Nina Kaganovich, a psychotherapist, on about ten occasions.  (R. 182-203.)

From May 2008 until May 2009, Henderson was treated by Dr. Jennifer Taniguchi of The Muscle Bone & Joint Center.  (R. 774- 85.)  She was initially evaluated for left knee pain, and was diagnosed with degenerative joint disease.  (R. 782.)  She was given injections for the pain in her left knee, which helped her condition.  (R. 778-80.)  Henderson then reported similar pain in her right knee, and she was treated with the same injections which also served to alleviate the pain.  (R. 774-77.)

On December 16, 2008, Henderson presented herself for an intake at Parkside-New Directions, a substance abuse treatment organization.  (R. 757-72.)  She reported daily use of alcohol and benzodiazepine, and weekly use of cocaine/crack.  (R. 761.)  She had a biopsychosocial evaluation conducted on January 16, 2009, at which time she reported a "thirty year history of chemical dependency."  (R. 751.)  She was referred for weekly treatment sessions, but at her January 20, 2009 session she arrived under the influence of alcohol and was sent home.  (R. 744.)  She attended a couple sessions thereafter, but on March 9, 2009 she was discharged from the treatment

---

[2] In his decision, the ALJ describes the procedural history of this case as "long and tortuous."  (R. 579.)

program due to "lack of attendance." (R. 739.)

On October 31, 2011 Henderson met with the consultative psychiatrist, Dr. Dilip Ramchandani. (R. 907-14.) In the mental assessment, the doctor noted no limitations in her ability to understand, remember, and carry out simple instructions, slight limitations in her ability to do the same with detailed instructions, and moderate limitations in making judgments on simple work-related decisions, appropriate social interaction, and responding to work pressures and changes. (R. 913.) Then, in December 2011, Henderson was evaluated at Best Behavioral Healthcare, and was diagnosed by Dr. Oscar E. Saldana with bipolar disorder and depression. (R. 798.)

### B.    Administrative Hearings and Civil Actions

#### 1.    The First ALJ Decision

After her claim was initially denied by the state agency, Henderson requested a hearing, which was held on January 19, 2006 by Administrative Law Judge ("ALJ") Paula F. Garrety. (R. 12.) At the hearing, ALJ Garrety took testimony from Henderson, Edward Fishburn, who had lived with her for about 13 years and is the father of her two youngest children, and a Vocational Expert ("VE"). (R. 20-47.) ALJ Garrety found that Henderson had demonstrated that she suffered from several severe medically-determinable impairments: "Chronic Hepatitis C; Major Depressive Disorder; Post Traumatic Stress Disorder; and Mood Disorder due to General Medical Condition." (R. 14.) Nonetheless, ALJ Garrety concluded that Henderson "had the residual functional capacity ["RFC"] to perform the full range of light work," and could perform occupations named by the VE. (R. 17.) ALJ Garrety issued an unfavorable decision on January 26, 2006, (R. 18), and on March 31, 2006, the Appeals Council denied Plaintiff's request for review. (R. 5-8.)

### 2. The First Civil Action and the Second ALJ Decision

On April 28, 2006, Henderson commenced a timely civil action (No. 06-1804) in the district court. (R. 280.) That civil action resulted in remand, upon motion of the Commissioner, for further administrative proceedings.[3] (R. 295.) On remand, ALJ Garrety held a hearing on June 6, 2007, taking testimony from Catherine Fishburn (Edward Fishburn's mother), and a VE. (R. 252-62.) Due to a technical error - "the hearing tape did not record the last 15 minutes of that hearing" - ALJ Garrety convened a supplemental hearing on September 5, 2007 to re-take the testimony of Catherine Fishburn and the VE. (R. 265-75.) On September 26, 2007, ALJ Garrety issued an unfavorable decision. (R. 219-29.) Despite having found that Henderson was limited to "perform[ing] sedentary and light exertion work, except the [Plaintiff] is limited to work which is self-paced and involves routine 1-2 step tasks and limited contact with public and/or co-workers," (R. 223), she again concluded that Henderson could perform occupations named by the VE. (R. 228-29.)

### 3. The Second Civil Action and the Third ALJ Decision

On December 13, 2007, Henderson commenced a second timely civil action (No. 07-5243) in the district court. (R. 280.) *Henderson v. Astrue,* No. 07-5243, "Complaint," Dec. 18, 2007 (Doc. No. 3.) The civil action was referred by District Court Judge James Knoll Gardner to Magistrate Judge Peter B. Scuderi for a report and recommendation ("R & R"). No. 07-5423 (Doc. No. 11.) On October 10, 2008, Magistrate Judge Scuderi issued his R & R which recommended remand for

---

[3] In the motion for remand, the Commissioner stated: "Upon further review by the Defendant, it has been determined that this case would benefit by further administrative proceedings and additional evaluation of Plaintiff's claims. Upon remand, the Appeals Council will vacate the administrative law judge's decision, dated January 26, 2006, and remand this case to an administrative law judge for further proceedings and a new decision." *Henderson v. Barnhart,* No. 06-1804, "Defendant's Motion for Remand," Sep. 21, 2006 (Doc. No. 9).

further administrative proceedings on four grounds, for the ALJ's failure: (1) "to accord proper weight to the opinion of [Plaintiff's] treating physician;" (2) to accord proper weight to Plaintiff's testimony; (3) "to ask the VE about a potential conflict between the VE's testimony and information contained in the <u>Dictionary of Occupational Titles</u>;" and (4) "to include [Plaintiff's] mental limitations when presenting a hypothetical to the VE." No. 07-5423 (Doc. No. 14 at 8-12, 14-16, 17-20, 20-21.) On December 11, 2008, Judge Gardner adopted Magistrate Judge Scuderi's R & R, and the matter was again remanded for further administrative proceedings. (R. 428-429.)

Following this second civil action, the case was assigned to ALJ Sylvester A. Puzio, who held a hearing on April 23, 2009. (R. 543-71.) At that hearing, Henderson and a VE testified. (*Id.*) ALJ Puzio issued an unfavorable decision on June 8, 2009, finding that "[Plaintiff] has the [RFC] to perform light work . . . except for work involving complex job tasks, and prolonged interactions with the public and co-workers," and could perform her "past relevant work as a pharmacy technician, and as a waitress." (R. 425, 427.)

### 4. The Third Civil Action and the Fourth ALJ Decision

On September 3, 2009, Henderson commenced a third timely civil action (No. 09-4038) in the district court. *Henderson v. Astrue,* No. 09-4038, "Complaint," Sep. 3, 2009 (Doc. No. 1.) That civil action resulted in remand, upon motion of the Commissioner, for further administrative proceedings. No. 09-4038 (Doc. No. 9.) In the uncontested motion for remand, the Commissioner specifically stated that "[o]n remand, the [] ALJ will take the following action, including, but not limited to: further evaluating Plaintiff's [] RFC, comparing Plaintiff's RFC to the physical and mental demands of her past relevant work, and, if warranted, obtaining supplemental vocational expert evidence." No. 09-4038, "Defendant's Uncontested Motion for Remand," Mar. 19, 2010

(Doc. No. 8 at 1-2.)

Following this remand, the case was assigned to ALJ Gerald J. Spitz, who held a hearing on December 8, 2010.  (R. 828-878.)  At that hearing, Henderson and a VE testified.  (*Id.*)  ALJ Spitz issued an unfavorable decision on January 14, 2011, finding that Henderson could "perform at least the full range of light work," and could perform her "past relevant work as a waitress."  (R. 813, 821.)  Plaintiff submitted exceptions to the Appeals Council on February 10, 2011.  (R. 681-84.)  The Appeals Council remanded the claim on May 16, 2011, directing the ALJ to (1) "[g]ive further consideration to the treating and examining source opinions . . . and explain the weight given to such opinion evidence;" (2) "[f]urther evaluate [Plaintiff's] mental impairment;" (3) [g]ive further consideration to [Plaintiff's] RFC;" and (4) "[i]f [Plaintiff] is found disabled, determine whether drug addiction and/or alcoholism are contributing factors material to the finding of disability."  (R. 658.)

### 5.   The Fifth ALJ Decision

On March 20, 2012, ALJ Spitz held another hearing.  (R. 879-906.)  ALJ Spitz closed the record at the conclusion of the hearing and, on May 24, 2012, issued his decision.  (R.575-604.)  He found that Henderson was not disabled based upon his finding that she retained the capacity to perform sedentary work and less than the full range of work at the light exertional level.  (R. 590-604.)  The ALJ further concluded that Henderson could perform the requirements of several light exertional and unskilled representative occupations such as packer, assembler/small product, sewing, and visual inspector.  (R. 603.)  That decision became the final decision of the Commissioner on July 24, 2012 as Henderson did not file exceptions and the Appeals Council did not assume jurisdiction on its own motion.   This litigation – Henderson's fourth civil action – followed.

7

## II.      STANDARD OF REVIEW

This Court must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).  Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence."  *Rutherford*, 399 F.3d at 552.  The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence.  *Richardson*, 402 U.S. at 390 (citing 42 U.S.C. § 405(g)); *Rutherford*, 399 F.3d at 552.  The review of legal questions presented by the Commissioner's final decision, however, is plenary.  *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## III.     DECISION UNDER REVIEW

The issue before the ALJ at the time of the May 24, 2012 decision, for purposes of the Title II claim, was whether Henderson was disabled within the meaning of the Act at any time since the alleged onset date of June 1, 2001 and September 30, 2001, the date last insured.   For purposes of the Title XVI claim, the issue was whether Henderson was disabled at any time since the alleged onset date of June 1, 2001.   In making this determination, the ALJ relied upon the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and 20 C.F.R. § 416.920(a).  At Step One, the ALJ found that Henderson, since the alleged onset date, had engaged in substantial gainful activity during the period between January 2010 and March 2011.  (R. 577, Finding No. 2.)  However, having found that "the record does not demonstrate that [Plaintiff] has engaged in substantial gainful activity throughout the entire period at issue," the ALJ then proceeded to the next

8

step of the sequential evaluation process.

At Step Two, he found that Henderson demonstrated that she suffered from a severe medically-determinable impairment, e.g., one that causes functional limitations and has more than a *de minimus* effect on her ability to perform basic work activities.  (R. 578, Finding No. 3.)  At Step Three, the ALJ concluded that Henderson did not have an impairment or combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 and therefore could not establish her entitlement to benefits on that basis, requiring that the evaluation process continue.  (R. 589, Finding No. 4.)  Plaintiff challenges the ALJ's finding at Step Three, arguing that she "meets 12.04 [affective disorders] and/or 12.05 [intellectual disability] of the Listing of Impairments."[4]  (Pl. Br. at 19.)

The ALJ then proceeded to assess Henderson's residual functional capacity ("RFC"), which is defined as "the most [a claimant] can still do despite [her] limitations."   20 C.F.R. § 404.1545(a)(1) and 20 C.F.R. § 416.92020(a).  In so doing he stated:

> **5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lifting and carrying a maximum of 20 pounds occasionally, with frequent lifting or carrying of objects weighing up to 10 pounds.  She is able to stand/walk up to six hours with normal breaks, and sit up to six hours, per eight-hour workday.     Given   the   absence   of   treatment   for degenerative/traumatic spine disorders, there are no additional postural, manipulative or environmental limitations referable to those impairments.  In light of her bilateral degenerative joint disease and her response to treatment as documented by Dr.**

---

[4] Although Plaintiff argues vigorously that the ALJ improperly rejected opinion evidence as to her mental impairments, she makes this argument that she meets one of the Listings for mental impairments in passing at the end of her brief.  Accordingly, we will not address this "Listings" argument separately.  We will instead address the issue of the severity of her mental impairments in our discussion of the remedy to be afforded to Plaintiff on pp. 23-25.

**Taniguchi, the undersigned finds it reasonable to preclude climbing of ladders, ropes or scaffolds, and she may only occasionally climb ramps and stairs, kneel, crouch, and crawl. The claimant also has the following nonexertional limitations relating to her mental impairments: she is unable to understand, remember and carry out complex instructions and tasks but she is able to perform short, simple instructions and one to two step tasks.**

(R. 590-91, Finding No. 5 (bold in original).)  At Step Four, the ALJ found that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Plaintiff] is 'not disabled,' whether or not [Plaintiff] has transferable job skills."  (R. 602, Finding No.9.)   Proceeding to Step Five, considering Henderson's age, education, work experience, and RFC, and relying upon testimony offered at previous hearings by VEs, the ALJ concluded that Henderson could perform the requirements of the representative light exertional and unskilled occupations of packer, assembler/small product, sewing, and visual inspector.  (R. 603, Finding No. 10.)   Accordingly, he found that Henderson was not disabled.  (R. 603, Finding No. 11.)

## IV.   DISCUSSION

Henderson asserts three bases for either vacating the ALJ's decision and finding her disabled and entitled to benefits, or remanding the case.  First, she argues that the ALJ accorded improper weight to the opinions of the mental health professionals who examined her.  (Pl. Br. 3-11.) Second, she argues that the ALJ improperly rejected the testimony of the lay witnesses that testified on her behalf.  (*Id.*at 11-15.)   Third, she argues that the ALJ did not adequately incorporate her knee limitations into his RFC assessment.  (*Id.*at 15-18.)   The Commissioner urges us to affirm the decision of the ALJ.

10

### A.      The Opinion Testimony of the Mental Health Professionals

In her brief, Plaintiff argues that the ALJ accorded improper weight to the opinions of the mental health professionals who examined her.  (*Id.* at 3-11.)  She specifically challenges the weight the ALJ accorded to the opinions of psychiatrists Ronald Rosillo, Dilip Ramchandani, and Oscar Saldana, and psychotherapist Nina Kaganovich.  We first address the opinions of Dr. Rosillo and Ms. Kaganovich from New Life Community Health Services ("New Life").  We then address the evaluations of Dr. Ramchandani at Drexel University and Dr. Saldana at Best Behavioral Healthcare.

### 1.      Dr. Ronald Rosillo and Ms. Nina Kaganovich

Dr. Rosillo treated Henderson at New Life between December 2004 and September 2006. (R. 191-95, 399-410.)  On December 10, 2004, he diagnosed her with "1) Major Depressive Disorder; 2) Postraumatic [sic] Stress Disorder; 3) Mood Disorder due to General Medical Condition," and assigned her a GAF score of 38.  (R. 191.)  He recommended individual psychotherapy, and prescribed her various depression and anxiety medications.  (*Id.*)  Nina Kaganovich, a psychotherapist who worked with Dr. Rosillo at New Life, had as many as 10 sessions with Plaintiff between November 2004 and December 2005.  (R. 183.)  Without providing any particulars Dr. Rosillo reported in a letter to Henderson's attorney of November 4, 2005 that "Joanne Henderson has been under our care since December 2004.  She is diagnosed with Major Depressive Disorder, Post Traumatic Stress Disorder, and Mood Disorder due to General Medical Condition.  It is our professional opinion that this patient is presently not capable of working."  (R. 182.)

The ALJ determined that this letter, which contained "[t]he only treating source opinion with regard to mental health impairment," would be "accorded no weight . . . as it is not a medical opinion."  (R. 599.)  As the ALJ noted "[m]edical opinions are statements from physicians and

11

psychologists or other acceptable medical sources that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." 20 C.F.R. § 404.1527(a)(2) and 20 C.F.R. § 416.927(a)(2).  The difficulty here, as set out by the ALJ, is that:

> Dr. Rosillo's correspondence does not satisfy this criteria . . . He did not indicate the symptoms that preclude [Plaintiff] from employment or when she became unable to work.  Nor did he provide specific limitations or a function-by-function mental assessment of what [Plaintiff] was still capable of doing despite her impairment.  His conclusory statement that [Plaintiff] is unable to work, is a judgment reserved for the Commissioner.

(R. 600.)  Plaintiff accepts this position, but points out that it "does not excuse the ALJ from explaining his rejection of the opinion."  (*Id.* at 8.)  Plaintiff relies upon SSR 96-5p which states:

> [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored.  The adjudicator is required to evaluate all evidence in the record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.  If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

Accordingly, we turn to the question of whether substantial evidence supports the ALJ's further explanation for discrediting Dr. Rosillo's opinion.

After reviewing the pertinent New Life records, the ALJ concluded that Dr. Rosillo's opinion was entitled to only "little weight."  In so doing, he stated:

> [T]he doctor's own treatment notes do not support a work-preclusive impairment.  His assertion that [Plaintiff] had been under their care since December 2004, can be taken only in the loosest sense.  He had seen [Plaintiff[ for an initial evaluation and four 15-minute medication visits from December 2004 through November 2005.  He

12

consistently documented [Plaintiff's] noncompliance with therapy sessions, medication management visits, and pharmacotherapy. His statement assumed [Plaintiff] had been at least intermittently compliant with medications. **However, unbeknownst to him, [Plaintiff] was not being truthful with him.** She advised her primary care physician that she was not taking any of the medications prescribed by Dr. Rosillo, although he thought she was (Exhibit 13F). He acknowledge[d] on re-evaluation that he had no direct observation from other sources to validate the issues being presented by [Plaintiff] (Exhibit 15F, 2/21/2006) and he was, therefore, basing his findings on [Plaintiff's] credibility in reporting her symptoms and response to pharmacotherapy accurately. The undersigned finds [Plaintiff's] sporadic treatment, noncompliance and/or misleading statements regarding compliance, to be inconsistent with a debilitating mental health impairment and can accord little weight to Dr. Rosillo's findings, diagnoses and GAF scores through September 2006.

(R. 600) (emphasis added).

Plaintiff argues that this explanation "is legally unacceptable" in that the ALJ "reject[ed] Dr. Rosillo's opinion on the ground that Dr. Rosillo relied on Plaintiff's statements, and Plaintiff is not credible." (Pl. Br. at 9.) In support of this proposition, Henderson cites to *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), which held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and **not due to his or her own credibility judgments**, speculation or lay opinion." *Id.* at 317 (emphasis added).

While we acknowledge that the ALJ cited a valid reason to assign "little weight" to Dr. Rosillo's opinion (referring to the sporadic nature of the treatment relationship between Henderson and the doctor), *see* 20 C.F.R. § 404.1527(c)(2)(i) and 20 C.F.R. § 416.927(c)(2)(i) (stating that the "[l]ength of the treatment relationship and the frequency of examination" are factors assessed in determining the weight afforded to treating opinions), we cannot overlook the fact that the ALJ also

made an impermissible credibility judgment in violation of *Morales*.  Pointing out inconsistencies between Henderson's statements to her primary care doctor and her statements to Dr. Rosillo is one thing, but in our view, concluding that she "was not being truthful with [Dr. Rosillo]" is a step too far.  We see no justification for this kind of credibility judgment based solely upon an inconsistency in the medical record.  Accordingly, we conclude that remand is necessary with the instruction that the ALJ properly determine the weight to be given to the opinion of Dr. Rosillo.

The ALJ's decision is further unsupported by substantial evidence in that he did not properly assess Ms. Kaganovich's opinion.  Ms. Kaganovich was Henderson's psychotherapist at New Life.  (R. 183.)  She provided therapy to Plaintiff during the time she was under Dr. Rosillo's care.  (*Id.*)  Like Dr. Rosillo, she provided a letter to Plaintiff's attorney where she reported that she had met with Plaintiff on ten separate occasions from November 24, 2004 to January 5, 2006.  (*Id.*)  She did not however offer her own assessment of Henderson's work-related mental limitations.  Rather, she simply concurred with Dr. Rosillo's assessment, stating that "I agree with Dr. Rosillo's opinion that this patient is presently not capable of working."  (*Id.*)

In the decision, the ALJ identified Ms. Kaganovich by name only once, stating that "[t]herapist, Nina Kaganovich, agreed with Dr. Rosillo's opinion."  (R. 584.)  He made further reference to the "therapist," almost certainly Ms. Kaganovich, in his summary of Plaintiff's treatment at New Life.  He noted that "[Henderson] had kept a total of 8 of her scheduled weekly therapy appointments."  (R. 583.)  He also described some of the progress notes from Plaintiff's meetings with the "therapist."  An August 3, 2005 note for example indicated that Henderson had just returned to therapy after three months of missed appointments, and reported that she had a good time with her children on vacation down at the shore but still felt depressed.  (R. 199, 584.)

14

The ALJ's treatment of Ms. Kaganovich's opinion falls short of the standard prescribed by our Court of Appeals.  The appellate court has long held that an ALJ "must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  *Burnett v. Commissioner of Social Security Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), and *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).  Such explanation is necessary so that, upon review, the district court can determine if "significant probative evidence was not credited or simply ignored."  *See id.* (quoting *Cotter*, 642 F.2d at 705).  Here, the ALJ made references to Ms. Kaganovich and her progress notes from her meetings with Henderson, but he failed to indicate how much weight (if any) he assigned to her opinion. [5] Accordingly, we conclude that the ALJ did not properly assess Dr. Rosillo and Ms. Kaganovich's opinion, and his decision is unsupported by substantial evidence.

### 2.    Dr. Dilip Ramchandani

Dr. Ramchandani, a psychiatrist at the Drexel University College of Medicine, examined Henderson on October 31, 2011.  (R. 907.)  He provided a thorough report of the meeting, which the ALJ summarized in detail.  (R. 586-87, R. 907-14.)  The doctor noted that she denied drug use, although the records he was provided documented a "30-year history of drugs and alcohol."  (R.

---

[5] We note that, on remand, Ms. Kaganovich's opinion will not be entitled to controlling weight.  Although Ms. Kaganovich describes herself as a "psychotherapist" in her letter, there is no indication that she is a licensed physician or psychologist.  (R. 183.)  For purposes of determining what is "an acceptable medical source" entitled to controlling weight, the Regulations define such sources as "(1) [l]icensed physicians . . . ; (2) [l]icensed or certified psychologists . . . ; (3) [l]icensed optometrists . . . ; (4) [l]icensed podiatrists . . . ; and (5) [q]ualified speech-language pathologists."  *Id.* Nonetheless, an ALJ "**may** also use evidence from other sources to show the severity of [the claimant's] impairments and how it affects [her] ability to work."  20 C.F.R §§ 404.1513(d) and 416.913(d) (emphasis added).  These sources include "nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and **therapists**."  20 C.F.R §§ 404.1513(d)(1) and 416.913(d)(1) (emphasis added).  Therefore, since Ms. Kaganovich, on the record before us, is a therapist without higher qualifications, her opinion will not be entitled to controlling weight.

908.)  In the portion of his report titled "Mental Status Examination," he stated that "[h]er mood is depressed, but the range was fairly broad . . . No perceptual abnormalities.  Thought processes are logical and relatively goal-directed." (R. 910.)  He further noted that her cognitive functioning, memory and concentration were intact.  (R. 910.)  He diagnosed her with depression, and assigned her a GAF score of "about 40."  (R. 911, 913.)   In his mental assessment, the doctor reported no limitations in her ability to understand, remember, or carry out simple instructions, and only slight limitations in her ability to do the same with detailed instructions.  (R. 913.)  He further noted moderate limitations in making judgments on simple work-related decisions, appropriate social interaction, and responding to work pressures and changes.  (*Id.*)

The ALJ accorded "only partial weight" to Dr. Ramchandani's mental assessment and GAF score, "to the extent it is consistent with the RFC."  (R. 600.)  He paid particularly close attention to the doctor's mental status examination, observing that the "normal/negative findings on mental status examination, including normal memory, concentration, orientation, and thought process" are inconsistent with the more severe limitations that the doctor imposed in the mental assessment.  (*Id.*)  Accordingly, the ALJ stated that "[i]t therefore appears that in formulating his assessments, the doctor relied heavily on the claimant's self-reported symptoms, which again, are indicative of inconsistencies and inaccuracies."  (*Id.*)

Plaintiff argues that, in rejecting the doctor's opinion, "the ALJ improperly plays doctor, substituting his lay judgment on a medical matter for Dr. Ramchandani's professional judgment.  The doctor by training and experience is qualified to assess the reliability of the patient he is interviewing." (Pl. Br. at 10.)  We cannot accept this argument as applied to the ALJ's treatment of Dr. Ramchandani's opinion.  First, the ALJ closely reviewed the doctor's report, (R. 586-587), and

reasonably concluded that the normal and negative findings in the mental status examination were internally inconsistent with the GAF score of "about 40" and the limitations imposed in his assessment.  (R. 600.)  While a GAF score of 40 is indicative of "[s]ome impairment in reality testing or communication . . . or major impairments in several areas," *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* ("DSM-IV") 34 (4th ed. 1994), Dr. Ramchandani found that Henderson's communication was unimpaired, and he found no major impairments in other areas.  (R. 907-14.)  Second, the ALJ did not make an impermissible credibility judgment of Plaintiff nor did he speculate as to any of the information that Henderson provided to the doctor.  As Dr. Ramchandani clearly noted in his report, under the heading "Substance Abuse History . . . [t]he patient appears to minimize, although according to the records provided to me . . . she has a 30-year history of drugs and alcohol."[6]  (R. 908.)  In that Dr. Ramchandani's assessment was internally inconsistent, and premised upon contradictory information, we conclude that the ALJ's assignment of "only partial weight" to his opinion is supported by substantial evidence.

### 3.    Dr. Oscar Saldana

On December 3, 2011, a little over a month after she met with Dr. Ramchandani, Henderson went to Best Behavioral Healthcare for a "[c]omprehensive [b]iopsychosocial [e]valuation."  (R. 787-93.)  She reported that she "feels she is Bipolar . . . can't deal with kids, relationship," and had suicidal thoughts.  (R. 787.)  She reported no history of cocaine abuse and claimed that she had been

---

[6] At the hearing, Henderson's representative argued to the ALJ that Dr. Ramchandani's claim that the records reflected that she had a 30-year-history of drug and alcohol abuse would not be borne out by the record. (R. 591.)  However, as the ALJ pointed out in his decision, in her treatment plan with Parkside Recovery and New Directions, an addiction treatment service, "[Henderson's] signature and/or initials appear on each treatment plan along with her diagnoses, including the **January 12, 2009 plan documenting a 30-year history of chemical dependency**." (R. 594.) (emphasis added).  We have undertaken a review of the document that the ALJ referred to in his decision and have determined that the ALJ's assertion is correct.  (R. 751.)

abstinent from alcohol for five years. (R. 789.) On mental status examination, her motor behavior was "[a]gitated" and her affect was "[l]abile." (R. 793.) The examination was otherwise recorded as normal including normal mood, speech, thought process, and perception, and good concentration/attention, memory, judgment, and insight. (R. 792.) She was then diagnosed with post-traumatic stress disorder and major depressive disorder with a GAF of 51. (*Id*.) The evaluation from was signed by a therapist and a psychiatrist. [7]

Almost a month later, on December 30, 2011, Dr. Saldana, a psychiatrist at Best Behavioral Healthcare, evaluated Henderson. (R. 795-798.) He provided a detailed "[p]sychiatric [e]valuation" of his meeting with her. (*Id*.) The doctor's mental status evaluation recorded clear "but pressured and circumstantial" speech, poor emotional regulation, varying impulse control, poor concentration, impaired judgment, but good attention, comprehension, and working memory. (R. 796-97.) The doctor further noted that she reported auditory and visual hallucinations, but there are no notations in the evaluation which relate to her history of alcohol dependency or substance abuse. (R. 796.) The doctor diagnosed bipolar disorder and depression with a GAF of 45, but ruled out "[m]ajor [d]epression recurrent, severe with psychosis." (R. 798.)

The ALJ accorded only partial weight to Dr. Saldana's evaluation. (R. 600.) In the decision, he summarized in detail both of Henderson's December 2011 evaluations concluding that the doctor's "diagnoses and GAF scores" were flawed in that they were based upon "inconsistencies and inaccuracies" in "[Henderson's] self-reported symptoms." (*Id*.) The ALJ further stated:

---

[7] The signatures are illegible, and there is no further indication in the record as to the identities of the examining therapist and psychiatrist.

> During both her December 2011 evaluations, [Plaintiff] denied any
> history of drug use and said she had been alcohol free for five years.
> Once again, [Plaintiff's] **failure to be forthcoming with examining
> and treating sources**, casts doubt not only on the accuracy of her
> complaints, but on their findings and assessments.

(*Id.*) (emphasis added.)

Here again, the ALJ's explanation for according only partial weight to Dr. Saldana's opinion

is based upon "his . . . own credibility judgment[]" and violates *Morales*.  225 F.3d 310, 317 (3d Cir.

2000).  While pointing out that Henderson provided inconsistent information to her treating sources

is appropriate, concluding that she "fail[ed] to be forthcoming with examining and treating sources"

constitutes a credibility judgment which we cannot accept as a basis upon which to reject the

doctor's opinion.  *See id.* at 316-17.  Accordingly, the ALJ's treatment of Dr. Saldana's opinion is

unsupported by substantial evidence.  We recommend remand on this basis.

**B.    The Testimony of Lay Witnesses**

Henderson next contends that the ALJ erred by according "little weight" to the testimony of

the two lay witnesses.  (Pl. Br. 11-15.)  Edward Fishburn ("Mr. Fishburn"), who had lived with

Plaintiff for about 13 years and is the father of her two youngest children, testified at a hearing held

on January 19, 2006.  (R. 41-46.)  Catherine Fishburn ("Ms. Fishburn"), Mr. Fishburn's mother,

testified at the hearing on June 6, 2007, and then again at a supplemental hearing held on September

5, 2007, as her original testimony had not been recorded.  (R. 265-71.)  Ms. Fishburn had known

Plaintiff since before 2001.  (R. 266.)

Both of the Fishburns testified that Henderson's symptoms had resulted in a high level of

dysfunction.  Mr. Fishburn stated that "she's not a normal person, she has no energy, she has just low

self esteem [sic] over her condition."  (R. 42.)  He further testified that she was unable to do much

19

work around the house, that he had to adjust his work schedule to take care of the children, that she had frequent mood swings, that she got upset easily, and that she couldn't sleep.  (R. 42-46.)  Ms. Fishburn similarly testified that since 2001 Henderson "stopped doing everything" including taking care of the children, that "her attention span is nothing," and that her sleep patterns were irregular. (R. 267-71.)

Under the Regulations, friends and family members are not "acceptable medical sources," and they cannot provide medical opinions.  20 C.F.R. § 404.1513(a), 404.1527(a)(2), 416.913(a), 416.927(a)(2).  Nonetheless, information from non-medical sources can be accepted as evidence.  20 C.F.R. § 404.1512(b)(4), 404.1513(d)(4), 416.912(b)(4), 416.913(d)(4).  "In considering evidence from 'non-medical sources,'" the SSR states that "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."  SSR 06-03p.  We now consider whether the ALJ's assignment of little weight to the testimony of Ms. and Mr. Fishburn was appropriate.

The ALJ provided two reasons for according little weight to this testimony.  First, pointing to specific examples in the record, he concluded that the testimony was "not supported by the findings of [Plaintiff's] contemporaneous treating physicians."  (R. 601).  He noted for example that the doctors treating Henderson's Hepatitis C in 2003 and 2004 indicated that she "tolerated the treatment very well and they specifically documented the absence of depression until September 2004."  (R. 161, 601.)  Second, he accorded little weight to the testimony of the Fishburns since it contradicted Plaintiff's own assertions.  (R. 601).  As the ALJ stated:

> [Plaintiff] has reported providing a level of care for her children as a homemaker and stay-at-home mom, that contradicts the testimony of the witnesses.  [Plaintiff] was unable to attend summer therapy sessions in 2005 and 2006 because her children were out of school and depending on her.  [Plaintiff] also testified that she opted for conservative treatment for her neck injury in August 2006 because her children were depending on her.  This is inconsistent with the Fishburn's assertions that they were providing 90% of the children's care throughout that timeframe.

(R. 601.)

We find these explanations to be supported in the record and we therefore conclude that the ALJ's decision with respect to the "little weight" he accorded to the Fishburns' testimony is supported by substantial evidence.

## C.    Knee Limitations

Henderson next contends that the ALJ did not adequately account for her knee limitations in the RFC assessment.  (Pl. Br. at 15-18.)  Specifically, "she argue[s] that the ALJ's finding that Plaintiff is 'able to stand/walk up to six hours with normal breaks' is inconsistent with his finding that Plaintiff has a 'severe' impairment [degenerative joint disease] of the knees."  (Pl. Reply at 8.)

In his decision, the ALJ discussed Henderson's knee impairment at some length.  (R. 583, 589, 598-99.)  He chronicled the treatment that she received from Dr. Jennifer Taniguchi in 2008 and 2009, finding the following items to be "of particular significance" in formulating the RFC:

> • The conservative and successful treatment of [Plaintiff's] bilateral knee pain and degenerative joint disease.  [Plaintiff] reported sudden onset of left knee pain in 2008 and new onset of right knee pain in 2009.  Dr. Taniguchi at The Muscle, Bone & Joint Center treated the complaints from May 2008 until May 2009.  She recommended therapy and home exercise, neither of which the claimant did.  The doctor then provided right knee Synvisc injections in 2008.  In March 2009, the doctor stated that Synvisc had worked so well for

21

the left knee that she would administer the same treatment for the right knee (Exhibit 19F).  [Plaintiff] has not followed up for knee complaints since then.  She has not been diagnosed with ambulatory dysfunction or prescribed pain medications or an assistive device for ambulation; and

- The lack of documented treatment for any physical impairment since seeing Dr. Taniguchi in 2009.

(R. 598-99.)   In the RFC assessment, the ALJ limited Plaintiff to light work that involved standing/walking no more than six hours in an eight hour day with normal breaks.  (R. 590.)  In addition, and as Plaintiff overlooks in her brief, he placed further functional limitations on her as a result of her knee impairment, stating that "[i]n light of her bilateral degenerative joint disease and her response to treatment as documented by Dr. Taniguchi, the undersigned finds it reasonable to preclude climbing of ladders, ropes or scaffolds, and she may only occasionally climb ramps and stairs, kneel, couch and crawl." (*Id.*)

The ALJ's RFC assessment as to the functional limitations arising from Henderson's knee impairment is supported by substantial evidence.  He accounted for her limitations by including her inability to climb and to stand or walk for the entire workday in the RFC, and he pointed to several record-based reasons for not having placed further limitations upon her.  He noted that she reacted well to treatment, having reported significant improvements in her left knee following the Synvisc injections, and having sought no further treatment after she received the same injections in her right knee.  (R. 598-99, 774-80.)  He further noted that the conservative treatment record, which included recommendations by the doctor that she do physical therapy and home exercise, did not include more aggressive measures like prescriptions for pain medication or an assistive device for ambulation.  (R. 598-99, 782-83.)  Moreover, the fact that Henderson did not follow the doctor's instructions to do

physical therapy and exercise, and her failure to seek any treatment for her knees after May 2009, undermine her complaints of disabling knee pain.  (R. 598-99, 774-83.)  In light of the above, this argument does not present a basis for remand.

### D.     Remedy

Plaintiff argues that, in light of our recommendation that the ALJ's decision is unsupported by substantial evidence, we should direct the Commissioner to award benefits as opposed to remanding the case for further administrative proceedings.  (Pl. Br. at 18-19.)  A court-ordered award of benefits is appropriate where "the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that a claimant is disabled and entitled to benefits."  *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).  Moreover, we should "hesitate to add further abeyance" and remand a case where, "like many others involving disability determinations, [it] has suffered considerable inexplicable delays."  *Morales v. Apfel*, 225 F. 3d 310, 320 (3d Cir. 2000) (citation omitted).

We acknowledge that this case comes to this Court with a lengthy administrative and district court history.  As we stated at the outset, Henderson applied for benefits over nine years ago, there have been six administrative hearings, five administrative decisions, and this is the fourth time that this case has been in the district court.  Nonetheless, we do not find that this case has "suffered [from] considerable inexplicable delays."  *Id.*  Each time that this case has been before the district court it has been adjudicated within a reasonable amount of time, and each time the case was remanded an ALJ has likewise held a hearing on this claim within an amount of time that we deem to be reasonable.  (*See* discussion *supra* on pp. 4-8.)  The only delay that we find to be "inexplicable" was when the testimony of Catherine Fishburn and the VE went unrecorded at the June 6, 2007

23

hearing.  (*See* discussion *supra* on p. 5.)  However, in that one instance of "inexplicable" delay, the ALJ made arrangements to re-take their testimony and did so within three months' time, issuing a decision within three weeks of that hearing.  (*Id.*)

Furthermore, we are unable to conclude that "substantial evidence on the record as a whole indicates that [Henderson] is disabled and entitled to benefits."  *Podedworny*, 745 F.2d at 221-22. We first note that we have not disturbed the ALJ's finding as to the weight he accorded to the testimony of the lay witnesses and his incorporation of Plaintiff's knee limitations into the RFC. (*See* discussion *supra* on pp. 19-23.)  With respect to the mental health issues, our finding that the ALJ's assessment of the opinions of Dr. Rosillo, Ms. Kaganovich, and Dr. Saldana was unsupported by substantial evidence cannot be said to support a conclusion that Plaintiff is entitled to benefits. We note that, despite the flaws in his analysis which require remand, the ALJ provided a thorough summary, considered the treatment of the opinions of the mental health professionals, and provided some rationale supported by the record to discredit those opinions.  (*See* discussion *supra* on pp. 11-19.)  As such, we are unwilling, as the reviewing court, and on the record before us, to recommend that benefits be awarded to Henderson.

## V.    CONCLUSION

As set forth above, we have found that the ALJ erred in his assessment of the opinions of Dr. Rosillo, Ms. Kaganovich, and Dr. Saldana.  His decision based upon this aspect of the record is therefore unsupported by substantial evidence.  We have however concluded that substantial evidence supports the ALJ's assessment of the opinion of Dr. Ramchandani, the testimony of the lay witnesses, and that the ALJ adequately incorporated Plaintiff's knee limitations into the RFC

assessment.  Finally, we have concluded that a court-ordered award of benefits is not appropriate based on the record before us.

### RECOMMENDATION

**AND NOW**, this 20th day of December, 2013, upon consideration of the brief in support of review filed by Plaintiff, Defendant's response thereto, and Plaintiff's reply thereto (Doc. Nos. 11, 14 & 15), as well as the administrative record, it is respectfully **RECOMMENDED** that the Plaintiff's request for review be **GRANTED**, the decision of the Commissioner be **VACATED**, and the matter **REMANDED** for further proceedings consistent with this Report.

BY THE COURT:

/s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE